May it please the Court, good morning. My name is Jeff Uvin and I am here on behalf of the Appellant Prima Exploration in this case. The United States Supreme Court, the United States Code at 5 U.S.C. 704, the Ninth Circuit Court of Appeals, the Tenth Circuit Court of Appeals, numerous district court cases including the jurisdictions of Alaska, Montana, and South Dakota, the BIA regulations at 25 CFR 2.6 and 43 CFR 4.314, the Interior Board of Appeals in numerous decisions dating back 30 years, and even the federal defendants in this case all say the same exact thing. Neither an agency or a court can require a party to exhaust administrative remedies if the underlying decision remains operative in the meantime. In other words, if the underlying decision is operative, there is no requirement to exhaust administrative remedies. Despite all the briefing in this case, all the briefing at the district court, all the briefing before the agency, the defendants in this case have not pointed to a single case other than the district court case on appeal here where a party was forced to exhaust administrative remedies even though the underlying case was operative. Well, so the problem with that argument, I think, is that I think it's probably collaterally estopped by the 2018 case. I realize you may have a different due process claim potentially, but you have the district court saying you have to exhaust, no appeal, and now you're coming and asking for the same thing. And so I don't know that that's your strongest argument given, but you can tell me that collateral estoppel doesn't apply here if you have that  We certainly do, Your Honor. The reason collateral estoppel doesn't apply here, even in all the cases that were used against Prima in this case on the issue of collateral estoppel, including Sandy Lake, if you look at the standard in those cases, it says, has the case remained substantially static factually and legally? Have the operative facts changed? And in this case, they certainly have. Number one, another four and a half years has passed. So now we're at 10 years that we've been before the administrative agency. And even more important, the facts have changed. The argument that was originally used before the district court the first time has been completely rejected by the agency, and they have a new legal argument that came out in 2018. You also have additional leasing decisions that have been made by the agency, including the agency retroactively approved an assignment from 1969, which Prima appealed, the stay should have been in place, and then the agency relied upon that decision, which has been appealed, which should have been stayed, to eradicate Prima's 60-year-old lease. I think you're making a really strong argument for a separate due process claim, but I'm not sure you're making a really strong argument for getting around exhaustion, because the district court said you have to exhaust, and that wasn't appealed. And that's, at least in part, you've got other arguments, too, but at least in part what you're arguing here. We're arguing that, and we did have a due process claim below. And we do have that cause of action that we argued, and we said different things have changed. And furthermore, on the issue of exhaustion itself, we brought a 706 claim. And under our 706 claim, we told the court, look, now we're at 10 years. We're at 9 1⁄2 plus years. And so under 706.1, which specifically grants a reviewing a court authority to say, you can order agencies to enforce the law to do things that have been unreasonably delayed. You can do things that order an agency to do certain things, such as just rule. Or what we asked for specifically first was enforce the automatic stay. Well, and that's a — that, I think, is — unless you're telling me otherwise, I didn't see that in the first case. You didn't argue 706 in the first case. So that isn't subject to collateral estoppel. Am I right about that? That is correct. We did not argue that the first time, because what we thought, under the first decision, the agency was applying a 1996 CFR. And at that time, we thought, this will certainly be overturned. On its face, it's not retroactive. We're going to win that argument. Turns out, we did. Because in 2018, a decision that came out after the judgment in the first case, the agency said, yep, we were completely wrong back in 2013. We've changed our view on that. It's not because of the 1996 CFR. It's because of this new retroactively approved assignment, which they did after the judgment in that case. So they completely changed their view on what law governed. And at that point, you're dealing with a whole new case, and you're certainly at that point dealing with the 706 claim, which specifically requires the court, which says 706 says shall, the court shall order an agency to do something unlawfully withheld or unreasonably delayed. That's what the statute says. Is there any argument that the 706 argument is raised judicata? Has anyone raised that argument that you could have raised that? I know you say you couldn't have raised it the first time around, but I'm just wondering if that's sitting the other... I don't think that is a valid argument in this particular case, because what we're talking about... Has anyone argued it, though? I'm just asking a simple question, if it was argued below and whether you can remember it being argued. I can't remember that offhand, whether they said those were included therewith. And I think the reason is it wouldn't be a good argument, because what we're talking about is the unreasonableness of the delay, number one, which has changed. We're now talking four and a half years. And we're also talking about unlawfully withheld, which is the automatic stay. So either one of those two things changes, and it depends upon the specific facts of the case. And so that's exactly what we've argued. And so I don't think under any theory of law would collateral estoppel apply to those claims. They weren't brought. They weren't litigated. And the specific facts that go into that 706.1 analysis have certainly changed. Now this is a big issue, the 706 issue, because we would be... You're asking us to order the administrative agency to do something. And one of the things I'm concerned about is drawing the line, which is at what point does a delay become unreasonable? So if an agency takes a year, is that too long? If an agency takes two years, is that too long? Does it require 10 years? And how do we make that determination? Well, I think the courts have said that the determination is made based upon a reasonableness statute. Why? A reasonableness standard. Why? Because that's specifically what the statute says. Has the delay been unreasonable? And I would submit that regardless of what the reasonableness standard is, 10 years is just too long. It's just too long. This is a simple issue. The title opinion in this case is in the record, I think at App 179. And it's incredibly short. All they have to do... Counsel, this is Jed Smith. Is there anything in the record to indicate that there is a process underway to reach a decision? Or is the position just that no decision is necessary? Well, no. It is currently on appeal before the IBIA. But one of the reasons... So there is a pending appeal that's being processed? There is, Your Honor. But one of the reasons why we filed the second PREMA lawsuit is because when we checked the docket, in eight months, we went from 40th in the queue. This is after four and a half years. We went from 40th in the queue to 42nd. We'd actually gone back two spots in the queue and other cases had jumped in front of us. And at that point, the delay is certainly unreasonable, particularly, Your Honors, when you're talking about a case where the automatic stay has not been enforced. The same exact minerals at issue in this lease are being produced and were leased by the BIA to two other parties, the other two defendants in this case. So all the while that this is taking place, where PREMA should have been protected by the automatic stay, which the BIA's own case law says is automatic and it's integral to an internal appeal. Because during that period of time, and sometimes these things take a long time, the party that we ruled against with the original decision is protected by that automatic stay in place. In response to Judge Smith's question, I just want to be sure, four and a half years since the IBIA first got the case. Is that the timeline? There were some previous proceedings before the BIA, the regional director, et cetera. But it's four and a half years it's been pending before that same board. Yes, Your Honor. Roughly, and these are rough dates, and it depends on if you're going from the record, but the rough dates are our first lawsuit was filed after four and a half years. We waited another four and a half years. We found out that they continued to make leasing decisions in the meantime. We appealed those decisions. Again, the last two appeals in this case occurred after the first judgment, because they continued to make decisions and they continued to put those decisions into effect. Another four and a half years has gone by, and so we would submit to the court that at this point, justice has been unreasonably delayed in this case, and we would order the court to just put the agency on a reasonable timetable to rule in this case and enforce the automatic stay in the meantime. I reserve the rest of my time. Thank you, Mr. Robin. Mr. Schaff. Thank you. May it please the Court. My name is Mike Schaff, and I'm an attorney for the U.S. Attorney's Office in North Dakota. I'm here today to argue on behalf of the Federal appellees, and I'll also be arguing on behalf of the other appellees, too. We've agreed to split time, but how much time is remaining will depend on how this goes. To start out with, I think, Judge Strauss, you hit it on one of the key points of this case. This isn't the first time this case was before the court. In 2018, Prima filed another case, exact same issues, exact same complaint, same causes of action, and litigated and decided that case. That case went all the way through to judgment and was dismissed for failure to exhaust administrative remedies. Prima filed the same case four years later. It's the same cause of action. It's the same parties. It's even the same judge. That case is a stop. You can't file the same case and expect the court to reach a judgment on the same issues. That's the essence of issue preclusion, and that's the principal reason why the case should be affirmed and dismissed. But that doesn't cover the 7051. I mean, that's a brand spanking new issue. That is. Prima did amend their complaint, and they added the 7061 issue, which is a new issue. You're right. 7061 allows the court to order an agency to do something if the action has been unreasonably delayed. That seems to be Prima's argument here, is that the court should order the IBIA, in this case, to take action because it's been unreasonably delayed. Now what 7061 allows a court to do is order a discrete and essentially a ministerial act to take place. So it's not the IBIA's actions in this case. Whatever the IBIA decides to do is not a ministerial act. I anticipate we're going to get an opinion that looks much like a judicial opinion from the IBIA on what these issues are and how these issues should be decided. That's not something that the court can just order, like, you know, for example, a lot of these 7061 cases deal with regulations and deadlines. So if Congress imposes a deadline on an agency to issue new regulations and the agency doesn't issue new regulations, can the court step in and say, you have to issue the new regulations? Maybe. I've got to be honest. I'm very concerned about this. There are a number of cases we heard in October from the IBIA, and this is endemic in that organization. That, you know, without saying how that case is coming out, three, four, five, six, seven years for a decision seems to be not only common but routine there. And meanwhile, they're not imposing the automatic stay. And so I wonder, because the statute says shall decide, the regulations say shall decide, the IBIA shall decide whether or not at some point when you get to year five or year six or year seven or year four, when you don't have a decision, it's unreasonably withheld. And that maybe we ought to make the ministerial decision to order the agency to act within a reasonable amount of time and reapply the automatic stay or apply the automatic. And I just want to get your response to that since you're representing the United States. But there is a real concern because we're seeing these cases over and over and over again. MR. GARRETT. And I acknowledge that the IBIA has taken time, and it's a significant amount of time in this case. And, you know, what I would say is two things. First, this is just one case before the IBIA. We don't have any information about what the other cases are in the IBIA's docket. If we start ordering this case to jump to the front of the line, that pushes every other case back one spot. So I would argue unless we know what we're pushing back, we shouldn't be moving this case forward. MR. STEINWALD. Or the IBIA could just get their case done, their cases done. If we took four or five years, there would be serious problems. We don't do that. We get them done usually within a few months, if not a year. So, I mean, at some point, we've got to fix this so that people get an answer to their questions. MR. GARRETT. And I'm not going to dispute that before you. But what I will say is it's not the Court's job to fix it. I think there's a lot of issues that we need to address. MR. NEUMANN. Is there in the record why the automatic stay is not effective or put in effect? MR. GARRETT. No. I would argue that the automatic stay, to the extent there is an automatic stay, it is effective. You know, the automatic stay is a regulation. It's 2.6 of the CFR. And what it says is that the agency cannot require an appeal to a higher agency authority unless by regulation, or excuse me, this is what Section 704 of the APA says. The agency can't require an appeal to a higher authority unless it stays that decision by regulation. The BIA has issued a regulation that says you must appeal regional directors' decisions to the IBIA. And while the appeal is pending, unless the IBIA steps in and says it's immediately effective, the decision is not immediately effective. So there's a regulation that states when the decision becomes immediately effective. And in this case, it didn't become effective because the IBIA has jurisdiction. MR. NEUMANN. So is there a dispute about that as to whether the decision is effective? What's actually happening to the assets that are involved here during this interim? MR. BELLOW. Well, that's a really good point, Judge. What's happening is the assets are being produced. Now, this is an oil and gas well, or a series of wells. It's an oil and gas property. It's very different from a surface lease. The lease for the oil and gas gives the right to explore for and produce oil and gas on the property. Prima had that lease in 1999, according to Prima. Our position, of course, is Prima didn't acquire anything. But if Prima thinks they acquired the lease in 1999, I'd suggest Prima could have developed the lease sometime between 1999 and when this legal dispute started in 2013. Prima did nothing. In 2013, Enerplus and PetroShale, the two other appellees in the case, came to us and said, we think, excuse me, we think this lease has expired. That's how our client got involved and determined that Prima's lease had terminated by its own terms. So, at that point, Enerplus and PetroShale released new properties. Enerplus and PetroShale have gone out and developed that property. They have drilled wells. They have produced oil and gas from the property. Now, the question is, how is that a violation of automatic, or not a violation of automatic stay, right? And the answer to that comes in the way that the automatic stay works. So, the decision in this case wasn't a decision to cancel a lease. It wasn't an affirmative act. The BIA didn't reach out and say, you know, for whatever reason, we're going to cancel your lease. What the BIA said is, you purported to buy this lease in 1999. Well, sorry, because the lease expired 20 years before you even purported to buy it. What the BIA said is, as a matter of law, because of the assignments of the lease and the cessation of production that occurred in 1993, the lease expired as a matter of law before Prima acquired it. So, there's nothing to be stayed. But there would be, because I think that you've gone and leased it out to other parties. So, the alternative, I think, contemplated by the APA is, you stay that to force the administrative agency to make a decision. Because otherwise, you can go out and do all of these other things without a stay, and then render a decision 10 years later. Well, it's 10 years later. These other parties now have the lease. And, you know, so I'm just not sure that's right. Yeah. And I appreciate your comment. And I think it's a difficult situation, because we have a situation here where what happened, actually, on December 17, 2013, when all of this got started, that same day, the BIA determined that Prima's lease expired and issued a new lease to Enterplus on the same day. 45 days later, on January 2014, Prima filed its first appeal. So, we already had a new lease to Enterplus by the time Prima filed its first appeal. So, I think, just factually, that's a distinction. But it is a tricky issue, because Prima clearly wants the IBIA to act. And, you know, I would argue that's what all this is about. That's what all this automatic stay argument is about. They want to try to force the court to take this out of the IBIA's hands. They want the court to say, because the IBIA hasn't acted soon enough, we're going to take it out of the hands. We're going to rule on the merits as a court, instead of letting the IBIA rule on the merits first. And that, I think, is where Prima gets off track, and for a couple of reasons. One, the purposes of exhaustion are to make sure that a record is developed, to make sure that we utilize the agency's expertise, and to make sure that when the case gets to this court, this court has a complete and full record. Let me ask you, though. Exhaustion is not jurisdictional, is it? Well... So, therefore, there can be exceptions, right? Correct. Why wouldn't this be a good case for an exception? Why do they have to wait a decade to get an  And, again, I would go back to the fact that we don't know what else is on the IBIA's docket. So, they have to wait a decade, because that's just where they are in the process. Now, is it unfortunate? Yeah. I wish they didn't have to wait a decade. I wish the IBIA was acting a little more quickly. But it's not up to the court to force the IBIA to act or to manage the IBIA's docket for it. That's up to the IBIA. And the IBIA will issue a decision in time in this case. There's no indication that the IBIA won't act. It's just a matter of waiting for the IBIA to act. You know, to follow up on that question, structurally, it seems to me that the stay and the requirement of exhaustion go hand in hand. That the reason why you're required to exhaust is because the status quo continues to remain in place. And, unfortunately, to get to Judge Grutter's point, we have it all upside down here, where we have no stay, but an exhaustion requirement that's taken nearly a decade, four and a half years or four years before the IBIA. So, why wouldn't it be a good idea, and I'm going to press you a little bit more, to just stay it? Even if we don't order the agency to act, why wouldn't we stay it? Because we've got an exhaustion requirement in place. And that goes to what staying it means. What does exactly it mean to stay it? So, does that mean they want Interplus to go and take their equipment off the well site and stop producing oil? Maybe that is what they want, but that is a significant change and a significant order. The status quo, and usually when we talk about a stay, we're talking about preserving the status quo. The status quo in this case is that Interplus drilled these wells, started producing this oil long before any of this occurred, even before the first case. Or at the time the first case was happening is when Interplus was drilling those wells. But it's, you know, more importantly than that, all of this, it's money. It's about redistributing the proceeds from this well, and that's what this case is about. Who profits from these oil wells? We can redistribute that money at any time. And the third point I would make in terms of why we wouldn't want to stay it, gets back to what all this is for in the first place. The IBIA, or excuse me, the BIA manages this land on behalf of Indian Allottees, and its obligation is to do what's in the best interest of those Indian Allottees. And in this case, it's in the best interest of those Indian Allottees to have an operator in place who can produce oil from this property and generate royalties for the Allottees. So we stay that, we take all those royalties away from the Allottees as well. Could we stay, I mean, I'm just throwing it out. Is there a possibility of a more limited stay, which is putting the money in escrow or having the IBIA or BIA regional director figure out what a stay means in this context? I mean, I just throw those out. Because you're right, it is a little complicated. You're pointing out, and I'll ask opposing counsel about it. Yeah, you know, maybe it's possible. I think the stay is a very difficult issue just because so much has gone on. Is it possible that the regional director could figure that out? Yeah, I suppose. I think the better solution, if the court is inclined to do that, a stay is just very difficult. I don't know how to implement that. Hearing no more questions, I would yield the rest of my time to my co-counsel and just ask that the court affirm the decision below. Thank you. Very well, thank you. Good morning, and may it please the Court. I'm Teresa Worden-Benz on behalf of Petrochelle. And I'm just going to focus on the issue of collateral estoppel or issue preclusion as it pertains to the claims, because that's another way to affirm the district court with respect to all of Prima's claims except for the 706, of course. There's really no question that all of the elements of issue preclusion are satisfied here. I think the district court recognized it in its opinion. It said it was rejecting the same claims made in Prima I, that Prima II was filed based on the same legal theories as the dismiss case, and that Prima's addition of two new claims and its addition of new parties does not change this Court's analysis. The Court also said nothing has changed since the dismiss case that excuses Prima's failure to exhaust administrative remedies. And so, really, all of the things that Prima points to, this additional delay, actions taken by the BIA and its appeal to the IBIA, they aren't the type of changes in controlling facts that would require them to be excused from issue preclusion. What about due process? I just point that out, because due process changes with time, right? There's a difference between waiting a year and waiting six years. And so would that be collaterally estopped? It would, because the issue of the delay and their due process claims, and my time's up. Can I — should I finish your question? We're before the Court in Prima I, and this Court may say Prima I got it wrong, and Prima may think that the Court got it wrong in Prima I, but what they should have done is appealed to this Court in 2018. Having failed to do so, that's the law of the case, and the same thing should apply, because to excuse them from that would allow them to keep repackaging, relitigating the same claims over and over again. Prima I said, go exhaust. They are exhausting. It's taking a long time, but to interrupt that process and allow them to come to court now would undermine both the purpose of issue preclusion and also the purpose of  the case. Just so the record is clear, the district court below did not rule on collateral estoppel, so what the defendants in this case are suggesting is that it's required somehow as a matter of law. And we know equitable estoppel is not jurisdictional. It's not as a matter of law. It's based upon the equities. It's based upon even in Sandy Lake, is there a good reason to look at this case again? Certainly in this case, of all cases, this is a case that needs to be looked at again. Four and a half more years have gone by, and the stay that is so integral to due process before an agency that takes a long time to rule is absolutely required in order for Prima, in the case of the Cooper case, that's what Darby, that's what Idaho watersheds, that's what the Cooper mining case, that's what all those cases say. We don't care, agency, what you call it, operation of law, an opinion, a determination, a decision. We don't care. If it's operative, if it's in effect, then you can go immediately to district court, because without that stay, we are deprived of our property right in the meantime. Judge Smith, in that, as was just mentioned by your opponent, fundamentally what's at stake here is money. If this takes another year to get decided, will you be able to recoup whatever losses you have incurred over the period you've been deprived of it, since what you're really looking for is the money? Thank you, Your Honor. And the pace we're on now, this will not be a year, it will be 10 or 20 years in the future. So whether or not we can recover money from some company in the future is up in the air. I guess what I'm asking is something similar to the irreparable harm. If what you're talking about is recouping lost profits, it seems a different scenario than the loss of a piece of real estate that's unique. Yes. And, Your Honor, it's more than just lost profits. It's the ability to mortgage. It's the ability to assign. It's the ability to sell. It's the ability to control the resource, to drill wells in the right way and the correct way. These wells and these formations can be damaged. It's Prima's property right, and Prima should have the ability, in the meantime, to protect that property right. So I would suggest to the Court that money is part of it. That would be an easy part of the stay. Put the money in escrow. Do an accounting. I would submit to this Court that these sophisticated entities, if the stay is enforced, it would be easy. Now, what does it look like? What does a stay look like in your view? Is it the escrow option? Because it's very complicated. I think the government made a pretty compelling case that it's complicated. And I would respectfully, with my good friend in counsel, disagree. It wouldn't be complicated. It would be an accounting. It would be an escrow. And it would be the parties working together like multiple lease owners work together in wells all the time. The Bakken, any piece of an area in the Bakken, commonly has no escrow. There's multiple, multiple parties involved. And that's what would happen here. But Prima would simply have a place at the table. This is our property right. We have rights before the Board of Oil and Gas Commission in North Dakota. And let's work this out. And it makes no difference that Prima wasn't already drilling. And maybe that's wrong, but that's what the government suggested. This lease goes back to 1952. And there were wells drilled and plugged and rentals paid that entire time. Prima took the lease, I believe, in 1999. But that doesn't change anything that for 10 years that lease has been terminated by the government without the stay being in place protecting Prima's rights. If nothing further, thank you, Your Honor. Thank you, Mr. Oden. Court thanks all counsel for their appearance and argument today. Case is submitted. And we will work on it and issue an opinion.